IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re<br><br>**SUNDANCE HOLDINGS GROUP LLC,**<br><br>Alleged Debtor. | Chapter 7<br><br>Case No. 25-11274 (KBO) |

**EMERGENCY MOTION OF CORBIN LIQUIDATION LLC,
AS ASSIGNEE OF SUNDANCE HOLDINGS GROUP LLC,
PURSUANT TO 11 U.S.C. § 543(d)(1) FOR ENTRY OF INTERIM ORDER
GRANTING RELIEF UNDER 11 U.S.C. § 543(a) AND (b), AND
SCHEDULING FINAL HEARING THEREON AND ON MOTION TO DISMISS**

Corbin Liquidation LLC, assignee (the "Assignee") for the benefit of creditors of Sundance Holdings Group L.L.C., the alleged debtor ("Sundance" or the "Alleged Debtor"), by and through its undersigned counsel, hereby moves (this "Motion") for entry of an order, pursuant to section 543(d)(1) of Title 11 of the United States Code (the "Bankruptcy Code"), to the extent necessary, for relief under section 543(a) and (b) of the Bankruptcy Code during the gap period (the "Gap Period") between the filing of the involuntary petition (the "Involuntary Petition") and the Court determining whether to dismiss the Involuntary Petition or enter an order for relief and (B) scheduling a hearing for the Motion to be considered on a final basis, along with any motion to dismiss this case filed by the Assignee. In support of this Motion, Assignee respectfully submits the supporting Declaration of Aron Schwartz filed herewith (the "Schwartz Declaration"), the Declaration of Jeff Klausner filed herewith (the "Klausner Declaration[1]"), and the exhibits annexed thereto, and states as follows:

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to them in the Schwartz Declaration or the Klausner Declaration, as applicable.

**PRELIMINARY STATEMENT**

1. On June 25, 2025, after an extended period of economic distress and unsuccessful attempts to obtain additional financing or a purchaser of its business as a going concern, Sundance, in an effort to preserve value for the benefit of creditors, entered into a general assignment for the benefit of creditors (the "Assignment") with the Assignee pursuant to Section 493.010 of the California Code of Civil Procedure ("CCP"). The Assignment was extensively negotiated between the Assignee and Sundance, with the full support of Sundance's senior secured creditors (the "Senior Secured Creditors") with a first priority secured lien over substantially all of Sundance's assets. The Assignment is being conducted pursuant to California law..

2. Since the Assignment, the Assignee has been operating Sundance's business in the ordinary course to sell Sundance's remaining inventory and has taken initial steps to commence a sale process that would culminate in the liquidation of Sundance's assets and payment of Sundance's creditors in order of their priority. To facilitate the Assignee's efforts, Sundance's Senior Secured Creditors agreed to a carve-out from their lien on collateral to ensure that there is sufficient funding for the Assignee to efficiently and successfully administer, and ultimately liquidate, Sundance's assets. The Assignee intends to file a motion to dismiss the involuntary petition and, if the Court ultimately grants such relief, the creditors of Sundance will have full recourse in the Assignment, including the right to file proofs of claim and seek other relief from California state courts, in the Assignment process already underway.

3. The Assignment was also completed with the support of Sundance Enterprises, Inc. ("Sundance Enterprises"), the licensor of the Alleged Debtor's rights to use the "Sundance" name on its clothing and other branded catalog products pursuant to a trademark license agreement (the "TLA") and a Personal Services Agreement (the "PSA") between Sundance and Redford

Enterprises, Inc. ("Redford Enterprises" and, along with Sundance Enterprises, the "Sundance Licensors").[2] Because those IP rights are central to maximizing creditor recovery, Sundance waited to make the Assignment until the same day that it obtained the Sundance Licensors' agreement not to oppose the Assignment and the transfer to the Assignment estate of the Sundance's rights under the TLA and PSA. By contrast, the Sundance Licensors have not agreed to support transfer of Sundance's licensed rights through a Chapter 7 case.

4. The requested interim relief is essential for the Assignee to confirm it is able to not only preserve, but to maximize, the value of the Alleged Debtor's seasonal inventory during the Gap Period. The Alleged Debtor's valuable assets include seasonal products that are located at the Alleged Debtor's leased retail stores and are declining in value as the seasonal window for which they were produced closes. Prior to the filing of the Involuntary Petition, the Assignee retained a consultant - SB360 Capital Partners, LLC ("SB360") - to advise it, and assist it with liquidating its inventory through "Going out of Business," "Store Closing," "Everything Must Go," "Sale on Everything," or similar themed sales (collectively "GOB Sales") at its leased retail locations. Interim relief from section 543(a), to the extent necessary to move forward with those GOB Sales during the Gap Period, is essential to preserving and maximizing the value of the Alleged Debtor's seasonal inventory before it becomes stale, and to ensure that the liquidation process at the Alleged Debtor's leased retail locations can be completed prior to expiration of the Alleged Debtor's current property insurance on September 30, 2025.

5. The Assignment proceeding is a more than sufficient forum for creditors, secured and unsecured alike, to seek redress regarding their claims against Sundance. Notwithstanding the

---

[2] A quarterly payment of $55,130.73 is coming due under the PSA during the Gap Period, and the Assignee must timely make that payment to avoid a dispute with the Sundance Licensors and preserve the Alleged Debtor's valuable IP rights in connection with its branded catalog.

3

pendency of the Assignment, a group of unsecured creditors (the "Petitioning Creditors"), after demanding and failing to obtain a favorable treatment in the form of payment of their unsecured claims ahead of all other claims,[3] commenced this involuntary chapter 7 case (the "Chapter 7 Case"). With the Assignment already underway and providing the necessary mechanism and forum for the relief sought by these creditors, the filing of the Involuntary Petition appears to be targeted at obtaining a tactical advantage by commencing proceedings in another forum, to the great detriment of the Assignee's efforts to monetize collateral – including the seasonal collateral that will rapidly deteriorate in value without immediate relief.

6. Before the commencement of the Chapter 7 Case, the Assignee was free to act under California law so as to preserve value for the benefit of creditors and pursue a value-maximizing sale transaction for Sundance's assets and had its Senior Secured Creditors' consent to do so. However, due to the effect of the Gap Period as well as the requirements of section 543 of the Bankruptcy Code, there is a potential ambiguity regarding the Assignee's ability to take certain actions the Assignee believes are necessary to preserve and maximize value, including to hire counsel and other professionals and consultants, to operate Sundance's business in the ordinary course to sell its seasonal inventory before it grows stale, and to conduct a sale of Sundance's other assets. Thus, in an abundance of caution, the Assignee seeks the critical interim relief requested in the Motion.

7. Moreover, timing is of the essence. The Assignee must be able to act quickly to liquidate Sundance's assets in a manner that maximizes value for the creditors. In particular, the filing of the Involuntary Petition threatens to derail the Assignee's prepetition efforts to preserve value by (a) delaying the liquidation of seasonal inventory that loses value if not sold during the

---

[3] Had such payment been made, it would have almost certainly been an avoidable preference under 11 U.S.C. § 547(b).

season for which it is produced, (b) exposing the Alleged Debtor to potential loss of licensed rights critical to monetizing its "Sundance" branded products, and (c) potentially losing access to the Senior Secured Creditors' cash collateral through valuable and essential carve outs from the Senior Secured Creditors' liens that may be unavailable to a Chapter 7 trustee.

8. The Assignee intends to file a motion to dismiss the Involuntary Petition. During the Gap Period in which the Involuntary Petition remains at issue, the Assignee seeks to be excused, on an interim basis (with a final hearing to be scheduled at the same time that the Court hears the Alleged Debtor's motion to dismiss the Involuntary Petition), from compliance with those requirements of section 543(a) and (b) of the Bankruptcy Code that would (i) require it to turnover any of the Alleged Debtor's assets as provided for in section 543(a), (ii) prevent the Assignee from operating the Alleged Debtor's business in the ordinary course in accordance with the Assignment, (iii) liquidating the Alleged Debtor's business in accordance with California law, including proceeding with the GOB Sales in accordance with the terms of the SB360 engagement letter. The requested relief is necessary during the Gap Period where no interim trustee has been appointed and no other custodian or fiduciary is available to administer and preserve the value of the assets.

9. Notably, the Petitioning Creditors have not sought the appointment of an interim trustee to preserve and maximize the value of the estate or prevent loss to the estate. *See* 11 U.S.C. § 303(g). The only effect of the filing of the Involuntary Petition, therefore, has been to create ambiguity as to what actions the Assignee can take during the Gap Period. This is value-destructive because, in the absence of the requested relief, the effect of the Involuntary Petition is that during the Gap Period no fiduciary will be empowered to take steps aimed at maximizing the value of the Alleged Debtor's assets, to the injury of all creditors.

10. The Assignee therefore files this Motion so that its ongoing efforts to preserve and maximize the value of the Alleged Debtor's assets may be sanctioned by this Court.

## JURISDICTION AND VENUE

11. This court (the "Court") has jurisdiction to hear the Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. §157(b).

12. Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

13. The statutory bases for the relief requested herein are §§ 105(a) and 543(d) of the Bankruptcy Code and related Federal Rules of Bankruptcy Procedures.

## BACKGROUND

14. A detailed factual background of Sundance, its corporate structure, its assets and liabilities, and the circumstances leading to the Assignment is set forth in the Schwartz Declaration filed herewith.

15. The primary business focus of the Alleged Debtor is to sell off inventory that it ordered months ago, much of which is seasonal, and declining in value as the season for which it was produced passes by. As set forth in the Schwartz Declaration, the Alleged Debtor decided in April 2025 to cease issuing purchase orders, stop accepting back orders on its system, cease selling gift cards, and attempt to cancel orders for the Fall season.

16. As set forth in greater detail in the Klausner Declaration, Jeff Klausner, the principal of the Assignee's manager, Resolution Financial Advisors, was engaged as a consultant to the Alleged Debtor for months prior to accepting the Assignment. During that time, Mr. Klausner familiarized himself with Sundance's operations and books and records so that he could "hit the ground running" in managing the winddown of the Alleged Debtor's business post-Assignment. Since the execution of the Assignment, the Assignee has operated Sundance's

business in the ordinary course, with a focus on maintaining the operations necessary to efficiently and effectively monetize that Alleged Debtor's inventory while advancing towards either a sale or complete winddown of operations.

17. As set forth in the Schwartz Declaration, as of June 25, 2025, Sundance was indebted to the Senior Secured Creditors under the Credit Agreement in the principal amount of $134,588,761.39, plus any unpaid interest and fees, and any accrued and accruing interest and fees incurred by the Senior Secured Creditors and payable by Sundance thereunder, all of which is secured by perfected first priority security interests in and liens upon substantially all property, interests, rights, and assets of Sundance.

18. On June 25, 2025, in light of Sundance's continuing defaults under the Loan Documents and Sundance's failure to obtain additional financing or a potential buyer of its assets, Sundance executed the Assignment, which is a general assignment of all of its assets to Assignee for the benefit of Sundance's creditors pursuant to the laws of the state of California. Pursuant to the Assignment, the Assignee was assigned all of Sundance's assets, obtained its books and records, and obtained information regarding the nature and location of the assets. A copy of the Assignment is attached as **Exhibit C** to the Klausner Declaration.

19. Concurrently with the Assignment, the Senior Secured Creditors (a) agreed to subordinate their senior security interests to the administrative fees, costs, and expenses of the Assignee, and (b) consented to the use of the Senior Secured Creditors' cash collateral to fund the administration and liquidation of the Sundance's property pursuant to the terms of the Assignment, in each case pursuant to expenditures by the Assignee of amounts identified in a 13-week cash flow forecast (the "Cash Flow Forecast") prepared by the Alleged Debtor and approved by the Senior Secured Creditors. A copy of the Cash Flow Forecast is attached to the Klausner

Declaration as **Exhibit D**. The Assignment therefore received full consent and support of Sundance's Senior Secured Creditors.

20. Prior to the filing of the Involuntary Petition, the Assignor retained SB360 as a consultant to advise it on conducting GOB Sales of the Alleged Debtor's inventory on the terms described in an engagement letter negotiated between Sundance and SB360 prior to the Assignment, a copy of which is attached as **Exhibit F** to the Klausner Declaration. The Assignee believes that GOB Sales are consistent with his authority under section 543 of the Bankruptcy Code to take action as necessary to preserve the value of such inventory. However, by this Motion, the Assignee seeks relief from section 543 in an abundance of caution to the extent necessary to move forward with GOB Sales during the Gap Period.

21. On or about June 20, 2025, counsel for the Petitioning Creditors contacted Sundance's counsel and indicated their intent to file an involuntary petition under chapter 7 of the Bankruptcy Code unless Sundance paid the Petitioning Creditors a sum in the aggregate of $2,130,125.65. *See* **Exhibit E** to the Klausner Declaration. The Assignee notified the Petitioning Creditors of the Assignment on the morning of June 26, 2025, just hours after the Assignment occurred, and well before the Assignee was required to do so under California law.[4]

22. Even though the Petitioning Creditors were well aware of the Assignment and their ability to seek recourse in Assignment-related proceedings, on July 2, 2025, when the Assignee refused to accede to their demand for payment of their invoices in full, they nonetheless filed the Involuntary Petition. The Petitioning Creditors have not sought the appointment of an interim

---

[4] Pursuant to CCP § 1802, "the [A]ssignee shall, within 30 days after the assignment has been accepted in writing, give written notice of the assignment to the assignors' creditors, equityholders, and other parties in interest." Section 1802 further requires that such notice establish a bar date for creditors to submit proofs of claim that is not less than 150 days nor greater than 180 days after the date of such written notice.

trustee pursuant to section 303(g) of the Bankruptcy Code, nor has one been appointed in this Chapter 7 Case.

23. In light of the Assignment, the filing of the Involuntary Petition was unwarranted and unnecessary. The Assignee is already well-suited under applicable law to administer and preserve the value of Sundance's assets, conduct a sale of its property, pursue any avoidance actions or other causes of action, conduct a claims resolution process, make distributions to creditors, and wind up the affairs of Sundance, all in a more efficient and less costly manner than can be achieved in a chapter 7 case. Moreover, the Assignee has the consent of the Senior Secured Creditors, and the support of the Sundance Licensors, to do so pursuant to the Assignment, neither of which are present in the chapter 7 case.

24. Under California law and the Assignment, the Assignee stands in the place of Sundance and has substantially all the powers of a trustee under chapter 7 of the Bankruptcy Code. *See Credit Managers Ass'n v. Nat'l Indep. Bus. Alliance*, 162 Cal. App. 3d 1166, 1170-1172, 209 Cal. Rptr. 119 (2d. Dist. 1984) (holding that assignee for benefit of creditors under California law holds legal rights of assignor and may act as assignor's legal representative with respect to the property, rights, and interests included in the assignment); Assignment, ¶¶ 6-7 (describing rights of Assignee and conferring power of attorney upon Assignee). The Assignment authorizes Assignee to obtain credit and to pursue causes of action for the benefit of creditors, and the Senior Secured Creditors have already agreed to the consensual use of their cash collateral in the exercise of Assignee's duties under the Assignment. *See* Klausner Declaration, **Exhibit C**.

25. Moreover, "[t]he law governing [assignments for the benefit of creditors] require[s] the third-party assignee to pay certain claims, such as secured claims or priority unsecured claims to be paid before any general unsecured claims." *Noah's Ark Processors v. CMBG Advisors*, Case

No. 2:19-cv-01057-CAS-JDEx) 2019 WL 1904668, at *1 (C.D. Cal. Apr. 29, 2019) (citing *Myzer v. Emark Corp.*, 45 Cal. App. 4th 884, 53 Cal. Rptr. 2d 60 (1996); Cal. Code Civ. P. §§ 1204 & 1204.5). With every passing day, the value of Sundance's assets are diminishing, whether because of the limitations on the Assignee's ability to administer assets and operate Sundance's business during the Gap Period as a result of the limitations of section 543 of the Bankruptcy Code or because of the increased costs associated with this chapter 7 case itself. Accordingly, so long as the Assignee is unable to fully perform its duties without the relief requested, the value of Sundance's assets will only continue to be diminished, to the detriment of all creditors.

## RELIEF REQUESTED

26. Through this Motion, the Assignee, in an abundance of caution, and pursuant to section 543(d)(1) of the Bankruptcy Code, hereby seeks entry of an order, substantially in the form attached hereto as **Exhibit A**, (i) determining that, during the Gap Period, to the extent necessary, the Assignee's operation of the Alleged Debtor's business in the ordinary course and administration of its assets under California law are excused from section 543(a) of the Bankruptcy Code, (ii) in the interests of creditors, excusing the Assignee's compliance with section 543(b) of the Bankruptcy Code on an interim basis during the Gap Period, (iii) setting a briefing schedule and hearing on the Assignee's forthcoming motion to dismiss the Involuntary Petition, and (iv) scheduling a final hearing on this Motion at the same time that the contemplated motion to dismiss is heard.

27. In particular, the Assignee seeks an interim order, pursuant to section 543(d) of the Bankruptcy Code, determining that it may take the following actions during the Gap Period regardless of sections 543(a) and (b) of the Bankruptcy Code:

RLF1 33257905v.1

(A)     Apply cash collateral of the Senior Secured Creditors as set forth in the Cash Flow Forecast;

(B)     Retain and compensate professionals in the Assignee's discretion in connection with this Chapter 7 case, as may be agreed to by the Senior Secured Creditors;

(C)     Perform its obligations under the engagement letter with SB360 (attached as **Exhibit F** to the Klausner Declaration) and coordinate with SB360 to conduct the GOB Sales on the terms described in the engagement letter;

(D)     Pay a quarterly fee of $55,130.73 to Redford Enterprises when it comes due during the Gap Period to preserve the Alleged Debtor's rights under the PSA.

## BASIS FOR RELIEF REQUESTED

28. Under section 543 of the Bankruptcy Code, a custodian is (a) prohibited from making any disbursement from, or taking any action in the administration of, property of the debtor, proceeds, product, offspring, rents, or profits of such property, or property of the estate, except such action as is necessary to preserve such property; (b) required to deliver to the trustee any property of the debtor held by or transferred to the Assignee; and (c) required to file an accounting of any of the debtor's property that came into the possession of the custodian. 11 U.S.C. § 543(a)-(b). The Bankruptcy Code defines "custodian" to include assignees for the benefit of creditors. 11 U.S.C. § 101(11). Notwithstanding these general rules, a custodian may disburse or administer estate property to the extent "necessary to preserve such property." 11 U.S.C. § 543(a). Moreover, a court may excuse compliance with sections 543(a) and (b) of the Bankruptcy Code "if the interests of creditors and, if the debtor is not insolvent, of equity security holders would be better served by permitting a custodian to continue in possession, custody, or control of such property…" 11 U.S.C. § 543(d)(1). Courts have described section 543(d)(1) of the Bankruptcy Code as "an abstention policy which permits the custodianship to continue if the best interest of creditors and stockholders is served…." *In re Sundance Corp.*, 83 B.R. 746, 747 (Bankr. D. Mont.

1988); *see also In re WPAS*, 6 B.R. 40, 43 (Bankr. M.D. Fla. 1980). *See also In re Plantation Inn Partners*, 142 B.R. 561, 564 (Bankr. S.D. Ga. 1992) (section 543(d) is "intended to provide flexibility when there is no useful purpose to be served by turnover.").

29.  As detailed below, section 543(a) of the Bankruptcy Code warrants the relief requested by the Assignee under the circumstances present here, and the Court should enter an order confirming the Assignee's authority to operate the Alleged Debtor's business and administer its assets pursuant to the Assignment, or, alternatively, excusing the Assignee's compliance with that section, and excusing the Assignee's compliance with the provisions of section 543(b) of the Bankruptcy Code.

**A. Allowing Assignee to Continue to Operate the Alleged Debtor's Business and Administer its Property during the Gap Period Will Preserve Value.**

30.  Section 543(a) of the Bankruptcy Code prohibits a custodian (including an assignee for the benefit of creditors) with knowledge of the commencement of a bankruptcy case from making disbursement from or taking any action in the administration of the property of the debtor that are in the possession, custody, or control of such custodian, "except such action as is necessary to preserve such property." 11 U.S.C. § 543(a). As stated above, the Assignee believes that the language of section 543(a) of the Bankruptcy Code on its face permits the Assignee to operate the Alleged Debtor's business in the ordinary course and administer its property because doing so preserves the value of the estate for all creditors. Nevertheless, the Assignee seeks an order out of an abundance of caution to the extent that such efforts are not otherwise permitted within the parameters of Section 543(a) of the Bankruptcy Code.

31.  The Assignee is well qualified to preserve the value of property of the estate. As set forth in the Klausner Declaration, the Assignee's manager, Resolution Financial Advisors, and Jeffrey Klausner, who is tasked with overseeing the operations of the Assignee, have extensive

experience in the administration of assignments for the benefit of creditors and advising or supervising other value-preserving and value-maximizing transactions and proceedings. Consistent with this expertise, as described in greater detail in the Klausner Declaration, the Assignee has expended significant efforts, pre- and post-Assignment[5] to become familiar with Sundance's assets and business operations and to preserve the value of the same since the execution of the Assignment.

32. Under the circumstances, the Assignee submits that it is appropriate that the Court determine that it may continue its efforts to preserve and maximize the value of the Alleged Debtor's assets during the Gap Period, where no interim trustee has yet been appointed, and the risk of diminution of value, especially (but not limited to) the seasonal merchandise, without an alternative means of preserving such value is heightened.

**B. Allowing the Assignee to continue administering property of the estate is in the best interests of creditors.**

33. Excusing the Assignee as may be appropriate from compliance with section 543(a) and (b) of the Bankruptcy Code is also warranted under section 543(d)(1) of the Bankruptcy Code. The central inquiry under section 543(d) of the Bankruptcy Code is whether it is in the interests of creditors (and, when the debtor is solvent, in the interests of equity holders) to require the turnover of estate property. *See* 11 U.S.C. § 543(d)(1). The Bankruptcy Code does not define what the term "interests of creditors" means in this context, but courts have formulated a list of relevant factors to consider. These include the following:

> (1) The likelihood of a reorganization;
> (2) The probability that funds required for reorganization will be available;
> (3) Whether there are instances of mismanagement by the debtor;
> (4) Whether turnover would be injurious to creditors;

---

[5] As noted above, Jeff Klausner, the principal of the Assignee's manager, Resolution Financial Advisors, acted as a consultant to the Alleged Debtor for months prior to accepting the Assignment.

(5) Whether the debtor will use the turned over property for the benefit of its creditors;

(6) Whether or not there are avoidance issues raised with respect to property retained by a receiver, because a receiver does not possess avoiding powers for the benefit of the estate; and

(7) The fact that the bankruptcy automatic stay has deactivated the state court receivership action.

*In re Packard Square LLC*, 575 B.R. 768, 778 (Bankr. E.D. Mich. 2017). Some of these factors presume that the custodian is a court-appointed receiver (factors 6 and 7) and are therefore inapplicable here. Other factors presume that the debtor is a debtor in chapter 11 proceedings (factors 1, 2, and 3) and, to the extent that such factors should be considered, weigh against turnover, as there will be no chapter 11 reorganization in this case. The Assignee submits that, because this case is an involuntary petition under chapter 7, the most relevant factor is whether turnover would be injurious to creditors.

34. Here, turnover would be injurious to the interests of creditors, who would be better served if the Assignee retained possession, custody, and control over the Alleged Debtor's property during the Gap Period to preserve its value, including liquidating the seasonal inventory before it goes stale. The Assignee, with the support of the Senior Secured Creditors, has already familiarized itself with Sundance's operations and books and records and has commenced efforts to monetize its seasonal inventory and pursue a sale of substantially all of Sundance's assets. Even if the Court ultimately enters an order for relief in this Chapter 7 Case, the resulting diminution in value that the estate would suffer in the Gap Period would only result in injury to creditors. Such injury includes: (1) the loss of value attributable to the pause in the Assignee's operation of the business and administration of the assets during the Gap Period; (2) expenses related to the chapter 7 trustee's duplicative efforts to become familiarized with Sundance's operations, assets, and finances; (3) potential loss of Sundance's IP rights related to the branding of its merchandise if it does not pay quarterly fees due under the PSA during the GAP Period; and (4) diminution

attributable to the costs associated with motion practice to obtain authorizations that the Assignee has already obtained from the Senior Secured Creditors, including authority to retain professionals and use cash collateral.

35.     The Assignee already has the full support of the Senior Secured Creditors to accomplish essentially identical goals that a chapter 7 trustee would seek to achieve in a chapter 7 case. As explained above, the Senior Secured Creditors agreed to a carve-out from their lien on collateral to ensure that there is sufficient funding for the Assignee to efficiently and successfully administer, and ultimately liquidate, Sundance's assets.  The Senior Secured Creditors have not agreed to a similar carve out to fund a Chapter 7 proceeding and are not obligated to do so.  Under these circumstances, it is therefore in the best interests of creditors that the Assignee continue to administer and operate Sundance's assets and pursue an orderly liquidation during the Gap Period with the consent of the Senior Secured Creditors.

36.     Excusing the Assignee from compliance with the turnover requirement of section 543(b) of the Bankruptcy Code is also appropriate because there is presently no trustee to whom the Assignee could transfer property in the Assignee's custody. Section 543(b) of the Bankruptcy Code presumes that there is a trustee to whom a custodian could turn over such property. *See* 11 U.S.C. § 543(b). In this case, the U.S. Trustee has not appointed a trustee and is not expected to appoint a trustee unless and until the Court enters an order for relief. *See* 11 U.S.C. § 701. Under such circumstances, the Assignee should be excused from compliance with section 543(a) and (b) of the Bankruptcy Code, at least on an interim basis, so that a fiduciary is in place, and may act to preserve and maximize the value of the Alleged Debtor's assets during the Gap Period. As the court noted in *In re Plantation Inn Partners*, section 543(d) of the Bankruptcy Code is "intended to provide flexibility when there is no useful purpose to be served by turnover." 142 B.R. at 564.

There can be no useful purpose to be served by turnover if there is no entity to receive the assets. Accordingly, the interests of creditors are best served if the Assignee continues to operate Sundance's business and is excused from turning over property subject to the Assignment.

### C. Conclusion

37. For these reasons, the Assignee submits that the optimal course of action is that the Assignee (i) be excused from the requirements of section 543(a) of the Bankruptcy Code to the extent necessary to permit the Assignee to continue to operate the Alleged Debtor's business in the ordinary course and administer its property during the Gap Period as set forth above and (ii) be excused from the turnover requirements of section 543(b) of the Bankruptcy Code during the Gap Period. The Assignee's prepetition efforts were essential to preserving and maximizing the value of Sundance's assets, and continued efforts to that effect remain essential postpetition. Pausing such efforts during the Gap Period will only result in an injurious diminution in value. Moreover, because there is no trustee to whom the Assignee can turn over the property, turnover during the Gap Period would be of no benefit. Accordingly, the Assignee respectfully requests that the Court grant the relief requested and such other and further relief as the Court deems just and proper.

### NOTICE

38. Notice of this Motion shall be given to (a) the Alleged Debtor; (b) the Petitioning Creditors; (c) the Agent; (d) any other secured creditors of the Alleged Debtor; (e) the Sundance Licensors; (f) Webster Capital; (g) the Office of the United States Trustee for the District of Delaware; and (h) all parties that have filed in this case a request for service under Fed. R. Bankr. P. 2002(i). The Assignee submits that no other or further notice need be provided under the circumstances.

WHEREFORE, the Assignee respectfully requests that this Court enter an order, substantially in the form attached hereto as **Exhibit A**.

Dated: July 9, 2025
      Wilmington, Delaware

*/s/ Russell C. Silberglied*
**RICHARDS, LAYTON & FINGER, P.A.**
Russell C. Silberglied (No. 3462)
Clint M. Carlisle (No. 7313)
Nicholas A. Franchi (No. 7401)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:   (302) 651-7700
Facsimile:   (302) 651-7701
Email:   silberglied@rlf.com
       carlisle@rlf.com
       franchi@rlf.com

**PERKINS COIE LLP**
Paul S. Jasper (admitted *pro hac vice*)
505 Howard Street
Suite 1000
San Francisco, CA 94105-3204
Telephone:   (415) 344-7000
Email:   pjasper@perkinscoie.com

Tina N. Moss (admitted *pro hac vice*)
1155 Avenue of the Americas
22nd Floor
New York, NY 10036-2711
Telephone:   (212) 262-6910
Email:   tmoss@perkinscoie.com

Rebecca J. Marston (admitted *pro hac vice*)
110 North Wacker Drive
Suite 3400
Chicago, IL 60606-1511
Telephone:   (312) 263-3554
Email:   rmarston@perkinscoie.com

*Co-Counsel to Corbin Liquidation LLC*